**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

| | | |
|---|---|---|
| **RYDEX, LTD.,** | § | |
| | § | |
| **Plaintiff,** | § | |
| | § | |
| **v.** | § | **Civil Action No. 4:11-cv-00122** |
| | § | |
| **FORD MOTOR COMPANY, et al.,** | § | |
| | § | |
| **Defendants.** | § | |
| | § | |
| | § | |

**<u>DEFENDANTS' RESPONSE CLAIM CONSTRUCTION BRIEF</u>**

# TABLE OF CONTENTS

**Page**

I.  Nature and Stage of the Proceedings .................................................... 1

II.  Statement of Issues ...................................................................... 2

III.  Legal Standards for Claim Construction............................................. 2

IV.  Summary of Argument ................................................................... 3

V.  Defendants' Construction of The Disputed Claim Terms ....................... 4

    A.  Disputed Terms Initially Appearing in the Preamble ......................... 5

        1.  "fluid delivery transaction" (claim 22) ................................... 5

        2.  "fluid container" (claim 22) ................................................. 8

        3.  "fluid delivery system" (claim 22).......................................... 9

    B.  Disputed Means-Plus-Function Terms ............................................ 10

        1.  "personal identification means for generating an identification signal identifying the person" (claim 22).................................. 10

        2.  "means associated with the fluid delivery system for storing and retrieving information and capable of being operatively linked to said personal identification means" (claim 22)........................ 14

        3.   "information communication means linking said fluid delivery system information means and said personal identification means" (claim 22)............................................................................ 17

        4.   "security means associated with said storage and retrieval device for verifying said identification signal prior to the delivery of fluid to the fluid container" (claim 22)............................................. 18

    C.  Other Claim Terms ..................................................................... 22

        1.  "for the transmission of operational energy for said personal identification means" (claim 22)............................................ 22

        2.  "information regarding the fluid delivery transaction is stored" (claim 22) ........................................................................ 23

        3.  "memory key" (claims 38, 39)............................................... 24

        4.  "ignition key" (claim 39) .................................................... 26

VI.  Rydex's Late Addition of Claims 39 and 40 Violates 35 U.S.C. § 305 ........ 27

    A.  Background................................................................................ 27

    B.  Two Critical Requirements Preclude Rydex's Improper Manipulation ............. 29

        1.  Rydex Improperly Enlarged Its Claims During Reexamination............. 29

**TABLE OF CONTENTS**
(continued)

**Page**

    2.    Rydex Added Its Dependent Claims For A Statutorily Improper
Purpose.................................................................................................... 31

VII.    Conclusion ...................................................................................................... 33

## INDEX TO APPENDIX

Tab 1 – U.S. Patent No. 5,204,819 and Reexamination Certificate

Tab 2 – Email from Steve Schlather, counsel for Rydex, to counsel for Defendants, dated June 4, 2012

Tab 3 – *TouchTunes Music Corp. v. Rowe Intern. Corp.*, No. 07-CIV-11450, 2012 WL 847274 (S.D.N.Y. 2012)

Tab 4 – Rydex, Ltd.'s Tutorial, dated May 29, 2012

Tab 5 – THE AMERICAN HERITAGE COLLEGE DICTIONARY, 3d. ed. (1993), p 674; NEW RIVERSIDE UNIVERSITY DICTIONARY (1994), p. 607

Tab 6 – Excerpts from Request for Reexamination of U.S. Patent No. 5,204,819

Tab 7 – Office Action, November 8, 2005

Tab 8 – Office Action, June 20, 2006

Tab 9 – *Maurice Mitchell Innovations, L.P. v. Intel Corp.*, 249 Fed. Appx. 184 (Fed. Cir. 2007)

Tab 10 – *Safoco, Inc. v. Cameron Int'l Corp.*, No. H-05-0739, 2009 WL 2424108 (S.D. Tex. July 31, 2009)

Tab 11 – Excerpts from Rydex's P.R. 3-1 Disclosures, dated Dec. 20, 2011

Tab 12 – Joseph B. White, *Honey, Where's My Keyless Fob*, THE WALL STREET JOURNAL, Oct. 1, 2005

Tab 13 – Amendment to the Claims, and Remarks, Jan. 12, 2006

Tab 14 – Excerpts from Deposition Transcript of Kent Herink, dated May 10, 2012

Tab 15 – *Total Containment, Inc. v. Environ Products, Inc.*, 106 F.3d 427, 1997 WL 16032 (Fed. Cir. 1997)

## TABLE OF AUTHORITIES

**Page**

CASES

*Aspex Eyewear, Inc. v. Marchon Eyewear, Inc.,*
    672 F.3d 1335 (Fed. Cir. 2012)....................................................................................7

*Astrazeneca LP v. Apotex, Inc.,*
    633 F.3d 1042 (Fed. Cir. 2010)..................................................................................23

*Baran v. Med. Device Techs.,*
    616 F.3d 1309 (Fed. Cir. 2010)..................................................................................17

*Blackboard, Inc. v. Desire2Learn Inc.,*
    574 F.3d 1371 (Fed. Cir. 2009)..................................................................................20

*Cardiac Pacemakers, Inc. v. St. Jude Med., Inc.,*
    296 F.3d 1106 (Fed. Cir. 2002)..................................................................................14

*Comaper Corp. v. Antec, Inc.,*
    596 F.3d 1343 (Fed. Cir. 2010)..................................................................................26

*Cordis Corp. v. Medtronic, Inc.,*
    511 F.3d 1157 (Fed. Cir. 2008)..................................................................................32

*Creo Prods., Inc. v. Presstek, Inc.,*
    305 F.3d 1337 (Fed. Cir. 2002).............................................................................2, 30

*Default Proof Credit Card Sys., Inc. v. Home Depot U.S.A., Inc.,*
    412 F.3d 1291 (Fed. Cir. 2005)..................................................................................21

*Eon-Net LP v. Flagstar Bancorp.,*
    653 F.3d 1314 (Fed. Cir. 2011).............................................................................6, 26

*ICU Med., Inc. v. Alaris Med. Sys., Inc.,*
    558 F.3d 1368 (Fed. Cir. 2009)....................................................................................6

*In re Freeman,*
    30 F.3d 1459 (Fed. Cir. 1994)....................................................................................31

*Lockheed Martin Corp. v. Space Systems/Loral, Inc.,*
    324 F.3d 1308 (Fed. Cir. 2003)..................................................................................15

*Markman v. Westview Instruments, Inc.*,
   52 F.3d 967 (Fed. Cir. 1995), *aff'd*, 517 U.S. 370 (1996) ........................................2

*Maurice Mitchell Innovations, L.P. v. Intel Corp.*,
   249 Fed. Appx. 184, 2007 WL 2777968 (Fed. Cir. 2007).......................................19

*Med. Instrumentation & Diagnostics Corp. v. Elekta AB*,
   344 F.3d 1205 (Fed. Cir. 2003)................................................................................19

*Medrad, Inc. v. MRI Devices Corp.*,
   401 F.3d 1313 (Fed. Cir. 2005)..................................................................................2

*Medtronic, Inc. v. Advanced Cardiovascular Sys., Inc.*,
   248 F.3d 1303 (Fed. Cir. 2001)...........................................................3, 14, 17, 20

*Mettler-Toledo, Inc. v. B-Tek Scales, LLC*,
   671 F.3d 1291 (Fed. Cir. 2012)................................................................................16

*Northrop Grumman Corp. v. Intel Corp.*,
   325 F.3d 1346 (Fed. Cir. 2003)..................................................................................3

*O2 Micro Int'l v. Beyond Innovation Tech. Co.*,
   521 F.3d 1351 (Fed. Cir. 2008)..................................................................................9

*Pfizer, Inc. v. Ranbaxy Labs. Ltd.*,
   457 F.3d 1284 (Fed. Cir. 2006)................................................................................31

*Phillips v. AWH Corp.*,
   415 F.3d 1303 (Fed. Cir. 2005)..........................................................................3, 6, 11

*Quantum Corp. v. Rodime, PLC*,
   65 F.3d 1577 (Fed. Cir. 1995)......................................................................29, 30, 31

*Safoco, Inc. v. Cameron Int'l Corp.*,
   No. H-05-0739, 2009 WL 2424108 (S.D. Tex. July 31, 2009) ........................19, 22

*Southwestern Bell Tel., L.P. v. Arthur Collins, Inc.*,
   464 F. Supp. 2d 588 (N.D. Tex. 2006), *aff'd*.........................................................32

*Springs Window Fashions LP v. Novo Indus., L.P.*,
   323 F.3d 989 (Fed. Cir. 2003)..................................................................................12

*Total Containment, Inc. v. Environ Products, Inc.*,
   106 F.3d 427, 1997 WL 16032 (Fed. Cir. 1997) ................................................31, 33

*Total Containment, Inc. v. Environ Products, Inc.*,
   921 F. Supp. 1355 (E.D. Pa. 1995) ....................................................................29, 32

*TouchTunes Music Corp. v. Rowe Intern. Corp.*,
No. 07-CIV-11450, 2012 WL 847274 (S.D.N.Y. Mar. 13, 2012)............................................7

*Vitronics Corp. v. Conceptronic, Inc.*,
90 F.3d 1576 (Fed. Cir. 1996).............................................................................................2, 3

STATUTES

35 U.S.C. § 112...................................................................................................... passim

35 U.S.C. § 132...............................................................................................................29

35 U.S.C. § 251...............................................................................................................30

35 U.S.C. § 305...................................................................................................... passim

OTHER AUTHORITIES

AMERICAN HERITAGE COLLEGE DICTIONARY, 3d. ed. (1993), at 674...........................................11

Joseph B. White, '*Honey, Where's My Keyless Fob*', THE WALL STREET JOURNAL, Oct.
1, 2005....................................................................................................................27, 28

NEW RIVERSIDE UNIVERSITY DICTIONARY (1994), at 607.............................................................11

U.S. Patent No. 5,204,819.......................................................................................... passim

In this Response Claim Construction Brief, Defendants jointly propose construction for 11 claim terms of the patent-in-suit, U.S. Patent No. 5,204,819 (the "'819 patent") (attached in the Appendix ("Appx") under Tab 1.  Defendants' proposed constructions are supported by both the intrinsic evidence and plain meaning of the terms and compelled by the invention actually disclosed in the patent—a system for controlling and making a record of a commercial refueling of a vehicle.  Moreover, the intrinsic evidence demonstrates that Plaintiff Rydex, Ltd. ("Rydex") impermissibly broadened the scope of claims 39 and 40 during reexamination of the '819 patent in an attempt to manipulate the claims to cover the movement of fuel inside a vehicle's fuel lines, such that Rydex could target Defendants' vehicles.  Defendants' claim constructions will facilitate the early resolution of this case because Defendants' vehicles do not infringe the properly construed claims of the '819 patent.

## I.   NATURE AND STAGE OF THE PROCEEDINGS

The parties filed their Joint Claim Construction and Prehearing Statement (D.E. 292) on April 27, 2012.  The parties agreed on several issues and claim constructions, but the constructions for 11 claim terms remain in dispute[1] and are ripe for the Court's consideration, as is the question of whether Rydex's addition of claims 39 and 40 constituted an improper broadening in violation of 35 U.S.C. § 305.  Rydex filed its Opening Claim Construction Brief on June 5, 2012.  *See* D.E. 301 ("Rydex Brief").

---

[1] Shortly before Rydex filed its Opening Claim Construction Brief, it informed Defendants that it was no longer asserting claims 27 and 28 of the '819 patent.  *See* Email dated Jun. 4, 2012, Appx. Tab 2.  Therefore, the Court is no longer being asked to construe the term "said vehicle identification signal," which appears only in claim 28.

## II.   STATEMENT OF ISSUES

The two issues presently before the Court are:

**1.  What is the proper construction of the 11 claim terms disputed by the parties?**

Claim construction is a question of law for the court and is subject to *de novo* review.

*Markman v. Westview Instruments, Inc.*, 52 F.3d 967, 979 (Fed. Cir. 1995), *aff'd*, 517 U.S. 370

(1996).  Defendants contend that their proposed constructions are proper because they are

compelled by the claim language, patent specification, and file history.  Rydex, on the other

hand, avoids construction of the terms to purposely leave ambiguities in the claims so that Rydex

can attempt to argue that Defendants' accused vehicles fall into the scope of the claims.

**2.  Was Rydex's addition of claims 39 and 40 improper under 35 U.S.C. § 305?**

The question of whether claims were improperly broadened during reexamination under

35 U.S.C. § 305 is a matter of claim construction and is also subject to *de novo* review.  *Creo*

*Prods., Inc. v. Presstek, Inc.*, 305 F.3d 1337, 1344 (Fed. Cir. 2002).  Defendants maintain that

Rydex improperly broadened the scope of claims 39 and 40 during reexamination because those

claims introduced new concepts that were not disclosed in the original patent.

## III.   LEGAL STANDARDS FOR CLAIM CONSTRUCTION

"It is well-settled that, in interpreting an asserted claim, the court should look first to the

intrinsic evidence of record, i.e., the patent itself, including the claims, the specification and, if in

evidence, the prosecution history."  *Vitronics Corp. v. Conceptronic, Inc.*, 90 F.3d 1576, 1582

(Fed. Cir. 1996).  Although claim terms are typically given their ordinary meaning, a court

"cannot look at the ordinary meaning of the term . . . in a vacuum.  Rather, [the court] must look

at the ordinary meaning in the context of the written description and the prosecution history."

*Medrad, Inc. v. MRI Devices Corp.*, 401 F.3d 1313, 1319 (Fed. Cir. 2005).  Claim terms must be

read "not only in the context of the particular claim in which the disputed term appears, but in

the context of the entire patent, including the specification." *Phillips v. AWH Corp.*, 415 F.3d 1303, 1313 (Fed. Cir. 2005).  The specification of a patent "is always highly relevant to the claim construction analysis.  Usually, it is dispositive; it is the single best guide to the meaning of a disputed term." *Vitronics Corp.*, 90 F.3d at 1582.  "[T]he interpretation to be given a term can only be determined and confirmed with a full understanding of what the inventors actually invented and intended to envelop with the claim.  The construction that stays true to the claim language and most naturally aligns with the patent's description of the invention will be, in the end, the correct construction." *Renishaw PLC v. Marposs Societa' per Azioni*, 158 F.3d 1243, 1250 (Fed. Cir. 1998).

The parties have agreed that certain of the disputed claim terms are "means-plus-function" terms governed by 35 U.S.C. § 112, ¶ 6.  *See* D.E. 292, at 2.  "In construing a means-plus-function limitation, a court must identify both the claimed function and the corresponding structure in the written description for performing that function." *Northrop Grumman Corp. v. Intel Corp.*, 325 F.3d 1346, 1350 (Fed. Cir. 2003).  "Structure described in the specification is 'corresponding' structure only if the specification or prosecution history clearly links or associates that structure to the function recited in the claim." *Medtronic, Inc. v. Advanced Cardiovascular Sys., Inc.*, 248 F.3d 1303, 1311 (Fed. Cir. 2001).

## IV.    SUMMARY OF ARGUMENT

Defendants' proposed claim constructions are fully supported by the intrinsic evidence and are consistent with the inventor's disclosure of what he actually professed to invent.  In particular, the '819 patent discloses a system for controlling a commercial transaction where a vehicle is refueled via a vendor's refueling station, mobile pump truck, or stationary tank.  The patent explains that many vehicles are operated as part of a commercial enterprise and, as a result, often times employees use company credit cards to pay for the refueling of their personal

vehicles instead of the company's vehicles.  The '819 patent discloses a system for preventing unauthorized dispensing of fuel and ensuring that the fuel delivered to company vehicles is properly recorded and charged.  The patent **never** mentions the movement of fuel **inside** of a vehicle.  When each of the disputed claim terms is read with a full understanding of the disclosed invention, and specifically in the context of the intrinsic evidence cited in this brief, it will be apparent that Defendants' proposed constructions are proper.

Rydex's proposed constructions, on the other hand, are a deliberate attempt to leave ambiguities within the claims in hopes that Rydex can try to convince a jury that the movement of fuel inside Defendants' accused vehicles somehow falls within the scope of the asserted claims.  No reader of the '819 patent, as originally issued, could ever reach the conclusion that the patent covered a system that controls the movement of fuel within a vehicle.  And Rydex knew this.  For precisely this reason, over a decade after the patent originally issued, Rydex initiated a reexamination proceeding before the Patent Office, whereby it sought to impermissibly enlarge the scope of its patent in hopes of covering Defendants' vehicles.  During the reexamination, Rydex added new claims 39 and 40, which introduced a new concept not disclosed in the original patent—the notion that the "fluid delivery system" could be a fuel pump inside of a vehicle and the "fluid container" could be the vehicle's internal fuel lines.  Now, Rydex repeatedly uses those new claims as the sole basis for attacking the constructions proffered by Defendants.  Because these claims did not exist at the time of the alleged invention and were improperly added later in an attempt to enlarge the scope of its patent coverage, these claims cannot be relied on to support Rydex's overbroad constructions.

## V.   DEFENDANTS' CONSTRUCTION OF THE DISPUTED CLAIM TERMS

Defendants have construed the claims to accurately reflect the meaning that each term would have to a person of ordinary skill in the art in question as of the application filing date.

**A.      Disputed Terms Initially Appearing in the Preamble**

The terms set forth below appear in the preamble of claim 22, as well in the body of the asserted claims.  The parties agree that the preamble of claim 22 is limiting but dispute the construction of the below terms.

**1. "fluid delivery transaction" (claim 22)**

| Rydex's Construction | Defendants' Construction |
|---|---|
| This term requires no construction. | a commercial exchange involving delivery of fluid |

The '819 patent is directed to the delivery of fluid **to** a vehicle, such as from a refueling station, and **not** the movement of fluid within a vehicle from its fuel tank to its engine.  A proper construction of the term "fluid delivery transaction" will make that clear and leave no room for the parties to later argue over the meaning of the term "transaction."  Rydex does not provide any construction for the term "fluid delivery transaction" in an effort to avoid the Court's ruling on this important issue and then later fashion whatever construction it wants at trial.

The word "transaction" is ordinarily used to refer to an exchange that is commercial in nature, and the '819 patent specification leaves no doubt that the same meaning should be attributed in claim 22.  Every description of every embodiment in the '819 patent confirms that a fluid delivery transaction is a commercial exchange, as in the following excerpts (emphases added):

- "Still another feature is a system for authorizing and memorializing a **fluid delivery transaction** that can be wholly controlled by an absent **purchaser** of the fluid."  '819 patent, col. 2, ll. 21-23.

- "A printer (not shown) may be located on the pump truck for the generation of **invoices** and the like so that a hard copy of the **fuel delivery transaction** can be left with the **customer**." '819 patent, col. 14, l. 68 - col. 15, l. 3.

- "Another feature of the present invention is positive identification of the fluid container for security and **billing** purposes to help prevent the delivery of fluid to unauthorized containers.  '819 patent, col. 2, ll. 3-6.

- "A further feature of the present invention is to permit automatic **payment for delivered fluid** without the use of an identification card or other like device."  '819 patent, col. 2, ll. 7-9.

- "Accurate and reliable records are necessary to assure that the appropriate vehicle receives the **purchased** fuel and, to the extent possible, that the miles logged by the vehicle correspond to actual **commercial**, not private, use."  '819 patent, col. 1, ll. 15-26.

When a patent specification repeatedly and consistently describes the invention in a certain context, the claims should be construed in that context.  *See Eon-Net LP v. Flagstar Bancorp.*, 653 F.3d 1314, 1321-23 (Fed. Cir. 2011) (construing "document" to be a "hard-copy document" because "[t]he written description repeatedly and consistently defines the invention as a system that processes information derived from hard copy documents.").  Accordingly, "fluid delivery transaction" must be construed in a commercial context because the '819 patent repeatedly and consistently describes a fluid delivery transaction as a commercial exchange.

Rydex's opening brief ignores the '819 patent specification, as it must to avoid acknowledging the fact that the '819 patent invariably describes the fluid delivery transaction as a commercial exchange.  The only reference by Rydex to the patent is the improper assertion that independent claim 22 must be construed to encompass dependent claim 39, which was inserted into the patent more than a decade after the patent was filed and is directed to a purported "embodiment" that was not described in the application for the '819 patent.[2]  *See ICU Med., Inc. v. Alaris Med. Sys., Inc.*, 558 F.3d 1368, 1376 (Fed. Cir. 2009) (rejecting argument that independent claim should be construed to encompass dependent claim added by amendment).  In any event, Rydex ignores the fact that a proper claim construction is determined as of the patent application filing date.  *Phillips*, 415 F.3d at 1313.  Because Rydex provides no discussion of

---

[2] The impropriety of this position is address in Section VI, *infra*.

how one of ordinary skill in the art would have understood the patent in light of the specification at the time of filing, Rydex has effectively offered no response to the overwhelming intrinsic evidence from the specification that a transaction is a commercial exchange.

A further flaw is that Rydex's infringement allegations in this case effectively assign no meaning whatsoever to the word "transaction" and would instead have "fluid delivery transaction" simply mean "fluid delivery."  First, the specification often uses the term fluid "delivery" by itself when it is referring to the mere act of delivering fluid.  *See, e.g.*, '819 patent, col. 1, ll. 19-22 ("Very often the vehicle is owned other than by the operator and fuel used by the vehicle is purchased by the absentee owner at the time **a fuel delivery** is made.") (emphasis added).  But when it is referring to a commercial exchange involving the delivery of fluid, it refers to the "transaction."  *See, e.g.*, '819 patent at col. 14, l. 68–col. 5, l. 3 ("A printer (not shown) may be located on the pump truck for the generation of invoices and the like so that a hard copy of the **fuel delivery transaction** can be left with the customer.") (emphasis added).  A transaction is a distinct and different concept from a delivery, and the term must be given life and meaning in the claim.  Rydex's attempt to construe "fluid delivery transaction" as simply a "fluid delivery" would render the term "transaction" superfluous, which is contrary to the law.  *See TouchTunes Music Corp. v. Rowe Intern. Corp.*, No. 07-CIV-11450, 2012 WL 847274, at *5 (S.D.N.Y. Mar. 13, 2012) (attached as Appx. Tab 3) ("A claim construction that renders claim language superfluous is almost always incorrect.") (citing *Stumbo v. Eastman Outdoors, Inc.*, 508 F.3d 1358, 1362 (Fed. Cir. 2007)); *see also Aspex Eyewear, Inc. v. Marchon Eyewear, Inc.*, 672 F.3d 1335, 1348 (Fed. Cir. 2012) ("Aspex argues that the district court's construction effectively reads the term 'free' out of the limitation. We agree.").

## 2. "fluid container" (claim 22)

| Rydex's Construction | Defendants' Construction |
|---|---|
| This term requires no construction. | a reservoir for storing fluid |

The '819 specification confirms the ordinary understanding that a container is a reservoir for storing fluid:

> The present invention relates generally to an apparatus for controlling the delivery of fluid to a **container or reservoir** and, more specifically, to an apparatus for the exchange of security, identification, and transaction information between **a container, such as a fuel or other fluid storage tank**, and a fluid delivery system.

'819 patent, col. 1, ll. 5-10, emphasis added.  Rydex offers no contrary evidence, but for the reference to claim 39, which was added improperly over a decade after the '819 patent's filing date.[3]  Aside from Rydex's misplaced reliance on claim 39, Rydex points to nothing to dispute Defendants' straightforward construction.

It is also important to note the unfavorable admissions Rydex has already made in this case.  For example, Rydex admits in its Complaint that a container is a reservoir:

> The '819 patent relates generally to an apparatus for controlling the delivery of a fluid to a **container or reservoir** and, more specifically, to an apparatus for the exchange of security, identification, and transaction information between **a container, such as a vehicle fuel tank or other fluid storage tank**, and a **fluid delivery system, such as a fuel pump and fuel lines**.

D.E. 154, ¶ 20 (emphasis added).[4]  Rydex understandably recognizes that its previous admission that fuel lines are not a container is fatal to its current, contrived infringement allegations, namely, that fuel lines are a container.  Accordingly, Rydex now seeks to dodge any construction of "fluid container."

---

[3] *See* Section VI of this brief, *infra*.

[4] Rydex also previously admitted that the fluid container is for holding fluid, not transporting it.  *See* D.E. 211, at 14 ("For instance, 'container' is commonly defined as 'a part of an apparatus in which liquid is held.'").  And, tellingly, even Rydex's technology tutorial labels a vehicle fuel tank as a "fluid container" and vehicle fuels lines as a "fluid delivery system."  *See* Rydex's Tutorial (attached hereto as Appx. Tab 4), at 9.

Consistent with Rydex's own recognition that a container is a reservoir, the container described in the '819 patent specification is, in every instance, a reservoir for storing fluid.  The specification's description of a fluid delivery system complements this understanding of container:  the specification repeatedly describes a fuel hose and fuel nozzle as part of the fluid delivery system (e.g., '819 patent, col. 4, ll. 37-45; col. 14, ll. 50-58), but never once suggests that the hose or nozzle is the "container."

The Court should construe this term to resolve the parties' dispute.  Because Rydex intends to argue to the jury that "fuel lines leading to an engine" fall within some unstated meaning of "fluid container," the Court should resolve this claim scope dispute at this stage of the proceeding.  *See O2 Micro Int'l v. Beyond Innovation Tech. Co.*, 521 F.3d 1351, 1362 (Fed. Cir. 2008) ("When the parties present a fundamental dispute regarding the scope of a claim term, it is the court's duty to resolve it.").

### 3. "fluid delivery system" (claim 22)

| Rydex's Construction | Defendants' Construction |
|---|---|
| This term requires no construction. | a system that transfers fluid from an external source to fluid containers |

Once again, the controlling intrinsic evidence leaves no doubt that a delivery system is a system that delivers fluid **to** vehicles, and never **within** a vehicle, as in the following excerpts (emphases added):

- "When the **fluid delivery system** is delivering, e.g., a petroleum-based fuel **to a vehicle**, usually via a fuel nozzle inserted into a fuel orifice of the vehicle . . . ." '819 patent, col. 1, ll. 55-58.

- "It is also desirable to control refueling operations so that fuel **delivered to the vehicle** is properly recorded and charged . . . ." '819 patent, col. 3, ll. 20-22.

- "In the most common situation, the truck tractor 12 will drive up to a fuel delivery location such as a **fuel service station**." '819 patent, col. 4, ll. 37-40.

- "For example, the fuel pump module 24 may be directly connected to a station computer or pump controller 30 (FIG. 1) which will subsequently transmit the information, e.g., over telephone lines, to the owner of the truck tractor 12 and, in certain circumstances, to the appropriate financial institution **for payment to the fuel pump owner for the fuel delivery made to the truck tractor 12**." '819 patent, col. 5, ll. 17-24.

Again, Rydex intentionally avoids any citation to or discussion of the '819 patent specification because, in the context of a vehicle, the specification consistently describes the delivery of fluid from an external source to the vehicle's fluid container. Defendants' construction is consistent with every single usage in the '819 patent specification, and Rydex's inability to refute this point should be dispositive.

**B.    Disputed Means-Plus-Function Terms**

The parties agree that the terms set forth below are means-plus-function terms governed by 35 U.S.C. § 112, ¶ 6, but the parties dispute the proper construction of the claimed function, the proper construction of the corresponding structure in the specification of the '819 patent for performing that function, or both.

**1.    "personal identification means for generating an identification signal identifying the person" (claim 22)**

| Rydex's Construction | Defendants' Construction |
|---|---|
| **Function** – generating an identification signal identifying the person<br><br>**Structure** – a programmable read-only memory device, a power receive coil, a signal transmitting coil, a phase shift key encoder and a modulator plus equivalents | **Function** – for generating a signal containing information that itself establishes the identity of the person requesting the fluid delivery transaction<br><br>**Structure** – a passive identification module that includes a memory that stores information that establishes the identity of the person |

**a.   Construction of the Claimed Function**

The claimed function of the "personal identification means" is "generating a signal containing information that itself establishes the identity of the person requesting the fluid

delivery transaction."  Defendants' construction of the claimed function is required by the claim language, the specification, and the file history of the '819 patent.

The primary distinction between the parties' proposed constructions is that Defendants' proposed construction gives meaning to the phrase "identifying the person" while Rydex's proffered construction purposefully attempts to leave it ambiguous.  As required by *Phillips*, Defendants' proposed construction of the claimed function is based on the ordinary meaning of the phrase "identifying the person."  In a straightforward and ordinary sense, the phrase "identifying the person" refers to the process of determining someone's identity.  For example, when asked for identification, a person would typically provide a driver's license, a passport, or a similar document that contains his or her name and picture.  This understanding of the term "identifying" is consistent with common dictionary definitions.  *See, e.g.,* THE AMERICAN HERITAGE COLLEGE DICTIONARY, 3d. ed. (1993), at 674 (defining "identify" as "to establish the identity of"); NEW RIVERSIDE UNIVERSITY DICTIONARY (1994), at 607 (same) (attached as Appx. Tab 5).  Thus, when given its simple meaning, a signal "identifying the person" is a signal with information that establishes the person's identity.

The specification of the '819 patent mandates the same simple approach to the phrase.  In particular, the specification provides various ways of identifying a person, namely the person's name or driver's license number.  '819 patent, col. 3, ll. 43-47.  Both of these types of information establish a person's identity and thus are consistent with the ordinary meaning of the phrase "identifying the person."  The specification also explains what type of information does **not** identify a person.  For example, the specification states that the memory key 522 "identifies the operator **and** provides the appropriate authorization code."  '819 patent at col. 11, ll. 33-36 (emphasis added).  The "and" in this excerpt indicates that information identifying a person

(here, the operator) is different than an authorization code.  Similarly, the specification

distinguishes a vehicle identification number from information that identifies a person:

> In response to the inquiry signal, the vehicle identification module 10 **transmits an authorization code** to the fuel pump module 24 **together with** the **vehicle identification number** of the truck tractor 12, the time, date, odometer and engine hour readings, the **operator's name and license number**, and the trailer identification numbers and odometer readings of the two trailers 14 and 16.

'819 patent, col. 4, ll. 60-67 (emphasis added).  Thus, the specification of the '819 patent

distinguishes information "identifying the person" in claim 22 from an authorization code or

information unique to a vehicle.  Information "identifying the person" must actually establish the

identity of a person, such as a name or driver's license number.  Any other reading manipulates

the asserted claims by eliminating an express claim requirement.

Defendants' proposed construction is further required by the file history of the '819

patent.  In its 2004 request for reexamination, Rydex argued to the Patent Office that its claims

were distinguishable over prior art references that disclosed the use of a "vehicle identification

code," because those prior art references did not disclose a signal identifying a person.  Request

for Reexam., Appx. Tab 6, at 27-28.  Claim 22 specifically recites a personal identification

means for generating an identification signal identifying the person who is requesting fuel

delivery, and was allowed by the Patent Office.  Office Action, Nov. 8, 2005, Appx. Tab 7, at 10;

Office Action, Jun. 20, 2006, Appx. Tab 8, at 5.  The public notice function of patents requires

that Rydex be held to the concessions it made to the Patent Office, and thus claim 22 requires

more than just a unique vehicle code—it requires an identification signal that actually establishes

a person's identity.  *Springs Window Fashions LP v. Novo Indus., L.P.*, 323 F.3d 989, 995 (Fed.

Cir. 2003) ("The public notice function of a patent and its prosecution history requires that a

patentee be held to what he declares during the prosecution of his patent.").

By asking the Court to leave open the question of what the phrase "identifying the person" means, Rydex again purposefully seeks to maintain ambiguity in the claims. Specifically, because Rydex accuses Defendants' vehicles of infringement, it is clear that Rydex intends to argue that an authorization code that is unique to a vehicle or vehicle key would satisfy this claim element, even though such a code does not establish a person's identity. Therefore, it important that the Court construe this limitation so as to remove any ambiguity and prevent Rydex from asserting infringement theories that directly contradict the clear import of the intrinsic evidence discussed above.

### b.  Identification of Corresponding Structure

The corresponding structure for the "personal identification means" is "a passive identification module that includes a memory that stores information that establishes the identity of the person."  As it must, Defendants' proposed structure comes directly from the specification of the '819 patent, which states the following:

> A passive identification module, indicated generally at 900 in FIG. 11, stores identification information for subsequent, repeated transmission to a fluid delivery device for the purpose of authorizing a fluid delivery transaction and for record keeping purposes regarding the transaction. . . . Identification information, such as the identity of a fluid container, fluid type for the container, and equipment type is stored in **a programmable, read-only memory device 902**. . . . Alternatively, **the passive identification module 200 may serve as an identification device for a person** rather than a fluid container.  **In such an instance, the information stored on the PROM 902 would be information identifying the person**.

'819 patent, col. 16, ll. 3-25 (emphasis added).  As shown in the above excerpt, each of the structures in Defendants' proposed construction—the passive identification module 900, and the memory 902 that stores information identifying the person—are clearly linked in the specification to the "personal identification means."

In contrast, Rydex's proposed structure is incorrect for at least two reasons.  First, Rydex ignores the fact that the memory must store information identifying the person in order to

perform the recited function.  *See* '819 patent, col. 16, ll. 22-24 ("the information stored on the PROM 902 would be information identifying the person").  Otherwise, there would be no way for the identification module to generate a signal "identifying the person" as required by claim 22.  Rydex's proposed structure is incomplete—memory alone is not capable of performing the function.  *See Cardiac Pacemakers, Inc. v. St. Jude Med., Inc.*, 296 F.3d 1106, 1119 (Fed. Cir. 2002) ("[C]orresponding structure must include **all** structure that actually performs the recited function.") (emphasis added).

Second, Rydex's proposed construction includes structures—namely, a power receive coil, signal transmitting coil, phase shift key encoder, and modulator—that are not clearly linked to the claimed function.  *See Medtronic, Inc.*, 248 F.3d at 1311 (the specification must "clearly link[ ] or associate[ ] that structure to the function recited in the claim").  In the '819 patent, the signal transmitting coil, PSK encoder, and modulator are used to "**transmit** the information stored on the PROM."  '819 patent, col. 16, ll. 47-48.  As such, they are only linked to transmitting a signal, and not the claimed function of "generating" an identification signal.  Similarly, the '819 patent states that the power receive coil is used to "**receive** the 153.6 kHz power signal."  '819 patent, col. 16, ll. 36-39.  Thus, the power receive coil is only linked to receiving a power signal, and not the claimed function of "generating" an identification signal. '819 patent, col. 16, ll. 36-39.

**2. "means associated with the fluid delivery system for storing and retrieving information and capable of being operatively linked to said personal identification means" (claim 22)**

| Rydex's Construction | Defendants' Construction |
|---|---|
| **Function** – storing and retrieving information<br><br>**Structure** – a central processing unit, memory and a data bus plus equivalents | **Function** – for storing and retrieving information and capable of being operatively linked to the personal identification means |

|  | **Structure** – a fuel pump module of a service station, pump truck, or stationary tank that includes a central processing unit and a non-volatile memory |
|---|---|

### a. Construction of the Function

Defendants' proposed construction of the function tracks the claim language, while Rydex's construction excludes claim language. "The phrase 'means for' . . . is typically followed by the recited *function and claim limitations*." *Lockheed Martin Corp. v. Space Systems/Loral, Inc.*, 324 F.3d 1308, 1319 (Fed. Cir. 2003) (emphasis in original). For the term "means associated with the fluid delivery system for storing and retrieving information and capable of being operatively linked to said personal identification means," the recited functions following the "means for" phrase are "storing and retrieving information and capable of being operatively linked to the personal identification means." Rydex's suggested construction improperly broadens the function of the term by reading out the limitation of "capable of being operatively linked to said personal identification means."

Defendants' proposed construction is supported by the specification, which discloses that the storing and retrieving means is capable of being operatively linked to the personal identification means. *See* '819 patent, col. 16, ll. 8-14 ("The passive identification module has no independent battery or other power source. **Operational energy is received** from an active communication module, indicated generally at 1000 in FIG. 12, **and associated with any of the gas pump module 24 (FIG. 7), the pump truck module 17 (FIG. 8), or the stationary tank module 19 (FIG. 9).**") (emphasis added). Accordingly, the language of the term as well as the specification warrant that "capable of being operatively linked to the personal identification

means" is part of the function of the claim term, and the Court should not accept Rydex's invitation to read out an express limitation of the claim.

### b.  Identification of Corresponding Structure

Defendants' identification of the structure as "a fuel pump module of a service station, pump truck, or stationary tank that includes a central processing unit and a non-volatile memory" is proper because it is the only structure disclosed in the specification that performs the recited function.  "[A] means-plus-function claim limitation is limited to structures disclosed in the specification and equivalents. . . . If a patentee chooses to disclose a single embodiment, then any means-plus-function claim limitation will be limited to the single disclosed structure and equivalents thereof."  *Mettler-Toledo, Inc. v. B-Tek Scales, LLC*, 671 F.3d 1291, 1296 (Fed. Cir. 2012).  The '819 patent specification describes three embodiments each with a fluid delivery apparatus.  The embodiments are: a refueling station, a pump truck, and a stationary tank.  '819 patent, col. 9, ll. 18-36 (disclosing the fuel pump module 24), col. 14, ll. 15-37 (disclosing the pump truck module 17), col. 15, ll. 4-18 (disclosing the stationary tank module 19).   The three types of modules function similarly.  '819 patent, col. 9, ll. 59-65, col. 10, ll. 24-27.

Taking the refueling station embodiment as an example, the specification expressly discloses that the fuel pump module 24 retrieves and stores information.  '819 patent, col. 5, ll. 13-15 ("Information collected by the fuel pump module 24 may either be stored for subsequent collection and processing or may be transmitted to a remote location.").  The specification also expressly discloses that the fuel pump module 24 is operatively linked to the personal identification means.  *See* '819 patent, col. 16, ll. 8-14 ("The passive identification module has no independent battery or other power source.  Operational energy is received from an active communication module, indicated generally at 1000 in FIG. 12, and associated with . . . the gas pump module 24 (FIG. 7)").

-16-

The fuel pump module, the pump truck module, and the stationary tank module are the only structures disclosed in the specification that are clearly linked or associated with the function of "storing and retrieving information and capable of being operatively linked to the personal identification means." *See Medtronic, Inc.*, 248 F.3d at 1311. Accordingly, the proper structure for this claim must be limited to the actual embodiments disclosed—i.e., the fuel pump module of a service station, pump truck, or stationary tank.

### 3.  "information communication means linking said fluid delivery system information means and said personal identification means" (claim 22)

| Rydex's Construction | Defendants' Construction |
|---|---|
| **Function** – linking said fluid delivery system information means and said personal identification means <br><br> **Structure** – a coil capable of transmitting a signal and a coil capable of receiving a signal | **Function** – for the communication of information between the fluid delivery system information means and the personal identification means <br><br> **Structure** – a signal transmitting coil and a signal receiving coil |

### a.  Construction of the Function

The plain language of this claim term requires that the function be construed as "for the **communication of information between** the fluid delivery system information means and the personal identification means." When language preceding the "means for" clause is purely functional, that language is properly construed to be part of the element's functional recitation. *Baran v. Med. Device Techs.*, 616 F.3d 1309, 1317 (Fed. Cir. 2010) (finding that the claim term "release means for retaining the guide in a charged position" recited both a release function and a retention function). Rydex's proposed construction of the function ignores the purely functional language of "information communication," and would instead broaden the claim by requiring only a means for linking the fluid delivery system means and the personal identification means. There is no disclosure in the patent that the fluid delivery system information means is linked to

the personal identification means for any function other than for the communication of information.  Accordingly, Defendants' construction is proper given the claim language and in the context provided by the patent specification.

### b. Identification of Corresponding Structure

Defendants' proposed structure of a signal transmitting coil and a signal receiving coil is proper because it is the only structure disclosed in the specification that performs the recited function of communicating information between the fluid delivery system information means and the personal identification means.  Rydex's proposed structure appears to be similar to Defendants' proposed structure, but Rydex suggests in its brief that a single coil might perform the claimed function.  D.E. 301, at 13.  A proper reading of the patent shows that two separate coils are required, one which transmits and one which receives.  *See* '819 patent, col. 16, ll. 47-57 (disclosing "signal transmitting coil 916" and "signal receiving coil 1012"); *id.*, FIGS 11-12.

### 4. "security means associated with said storage and retrieval device for verifying said identification signal prior to the delivery of fluid to the fluid container" (claim 22)

| Rydex's Construction | Defendants' Construction |
|---|---|
| **Function** – verifying said identification signal prior to the delivery of fluid to the fluid container | **Function** – verifying said identification signal prior to the delivery of fluid to the fluid container |
| **Structure** – a signal receiving coil, a demodulator and a phase shift key decoder plus equivalents | **Structure** – *The specification does not disclose sufficient structure for performing the recited function and therefore claim 22 is invalid at least under 35 U.S.C. § 112.* |

The parties agree that the function of the "security means" is "verifying said identification signal prior to the delivery of fluid to the fluid container."

However, the '819 patent fails to disclose any corresponding structure for the claimed function of the "security means."  It is well-established that the quid pro quo for using a means-

plus-function limitation is specificity in disclosing and linking structure to the function.  *Maurice Mitchell Innovations, L.P. v. Intel Corp.*, 249 Fed. Appx. 184, 188, 2007 WL 2777968, *4 (Fed. Cir. 2007) (attached as Appx. Tab 9).  "If the specification is not clear as to the structure that the patentee intends to correspond to the claimed function, then the patentee has not paid that price but is rather attempting to claim in functional terms unbounded by any reference to structure in the specification."  *Med. Instrumentation & Diagnostics Corp. v. Elekta AB*, 344 F.3d 1205, 1211 (Fed. Cir. 2003).  Thus, failing to disclose adequate structure to perform the recited function results in the claim being indefinite under 35 U.S.C. § 112, ¶ 2.  *Safoco, Inc. v. Cameron Int'l Corp.*, No. H-05-0739, 2009 WL 2424108, at *14 (S.D. Tex. July 31, 2009) (attached as Appx. Tab 10).

Here, the specification of the '819 patent does **<u>not</u>** disclose any structure for performing the function of "verifying said identification signal prior to the delivery of fluid to the fluid container."  The specification does not use the terms "verify," "verifying," or "verification" at all.  The closest thing to the recited function that appears in the specification is a discussion of authorization and/or confirming an authorization code.  But, as discussed above, an authorization code is **<u>not</u>** a personal identification signal.  Thus, because the specification does not even discuss the actual claimed function, it certainly does not link a structure to that function.

Moreover, even the portions of the '819 patent that discuss authorization never disclose a structure for performing the authorization.  For example, the specification states the following:

> [T]he vehicle identification module 10 transmits an authorization code to the fuel pump module 14…. **If the authorization code is correct**, the fuel pump module 24 will activate the fuel pump to permit the delivery of fuel.

'819 patent, col. 4, l. 60–col. 5, l. 1 (emphasis added).  This sentence suggests that an authorization code is checked, but does not provide any structure for doing so.  It simply

describes an outcome (i.e., "the authorization code is correct"), not a means for achieving that outcome. This is true for the entire specification of the '819 patent.[5]

At best, the specification of the '819 patent merely states the function of checking an authorization code, which is not even the specific function claimed in the "security means" element. But even assuming that checking an authorization code is related to the claimed function, the Federal Circuit has held that restating a function in the specification is not structure and thus does not satisfy 35 U.S.C. § 112, ¶ 6. *See Blackboard, Inc. v. Desire2Learn Inc.*, 574 F.3d 1371, 1384 (Fed. Cir. 2009) ("[T]hat language 'simply describes the function to be performed.' It says nothing about how . . . those functions are performed. As such, the language 'describes an outcome, not a means for achieving that outcome.'"). Because the '819 patent does not clearly link any structure to the function of "verifying said identification signal prior to the delivery of fluid to the fluid container," claim 22 is indefinite.

The components identified in Rydex's proposed construction are not corresponding structures under 35 U.S.C. § 112, ¶ 6 because they are not clearly linked or associated with the claimed function. *Medtronic, Inc.*, 248 F.3d at 1311. Rydex argues that the corresponding structure for the "security means" is "a signal receiving coil, a demodulator, and a phase key decoder plus equivalents." Rydex Brief, at 13. However, Rydex does not point to a single portion of the specification that links any of these components to the recited function of "verifying said identification signal prior to the delivery of fluid to the fluid container." That is because there is no such link in the '819 patent. The components proffered in Rydex's proposed

---

[5] *See* '819 patent, col. 1, ll. 44-45 ("permit fluid delivery if the container is authorized"); col. 3, ll. 47-49 ("if the authorization code is correctly identified by the vehicle identification module as an authorized code"); col. 5, ll. 7-12 ("If the appropriate authorization code is not received, the fuel pump module 24 will turn off the fuel pump and in this way prevent delivery of fuel to an unauthorized vehicle or fuel tank"); col. 9, ll. 37-42 ("[t]he required authorization code is input from a 2K bit memory key"); col. 10, ll. 63-65 ("[i]f the authorization code is recognized by the fuel pump module 24, the delivery of fuel will begin"); col. 11, ll. 7-8 ("[i]f no authorization code is received, the fuel delivery will be discontinued"); col. 11, ll. 33-36 ("[t]he memory key 522 identifies the operator and provides the appropriate authorization code which will permit a fuel delivery operation to proceed in an override condition").

construction are discussed at col. 16, ll. 57-68 of the '819 patent.  This portion of the

specification does not even mention verification of an identification signal.

Rydex's proposed construction also fails because the components identified by Rydex

cannot perform the function of verifying the identification signal.  *Default Proof Credit Card*

*Sys., Inc. v. Home Depot U.S.A., Inc.*, 412 F.3d 1291, 1299 (Fed. Cir. 2005) (holding that, in

addition to being clearly linked to the recited function, the structure must be "capable of

performing the function claimed").  The '819 patent explains that a PSK encoder 912, modulator

914, and signal transmitting coil 916 are used to transmit an identification signal from the

passive identification module to the active communication module.  '819 patent, col. 16, ll. 47-

50.  The active communication module has a corresponding set of components—namely a

receiving coil 1012, demodulator 1010, and PSK decoder 1018—that are used to **receive** the

identification signal being transmitted by the passive identification module.  '819 patent, col. 16,

ll. 53-68.  Thus, the encoder, decoder, modulator, demodulator, transmitting coil, and receiving

coil disclosed in the '819 patent are used to facilitate the **transmission** of the identification

signal from one module to another.  None of these structures "verify" the **personal** identification

information contained in the identification signal.  As such, they do not perform the recited

function of the "security means."

Therefore, the specification of the '819 patent does not disclose any structure that is

linked to the claimed function of "verifying an identification signal prior to the delivery of fluid

to the fluid container."  As a result, claim 22 and all the other claims asserted in this case are

indefinite under 35 U.S.C. § 112, ¶¶ 2, 6.  Since indefiniteness is a matter of law that is

inextricably intertwined with claim construction, *Safoco*, 2009 WL 2424108, at *15, Defendants

raise this issue in their claim construction brief.[6]

## C.     Other Claim Terms

The parties dispute the proper construction of the following additional terms:

### 1. "for the transmission of operational energy for said personal identification means" (claim 22)

| Rydex's Construction | Defendants' Construction |
|---|---|
| for the transmission of power to the personal identification means | for the transmission of power to the personal identification means which has no independent battery or other power source |

Defendants' proposed construction of this term is mandated by the claim language itself

and the specification of the '819 patent.  The claim term "operational energy" on its face plainly

refers to the energy needed to operate something.  And, in the context of the disputed claim

phrase, the something being operated is clearly "the personal identification means."  The

remainder of this element of claim 22 specifies that the energy needed to operate the personal

identification means comes from "an RF link."  '819 patent at claim 22 ("an RF link … for the

transmission of operational energy").  Thus, because the personal identification means receives

the energy it needs to operate from an RF link, it follows that the energy needed to operate does

not come from its own battery or other power source.  As such, the ordinary meaning of the

claim language supports Defendants' proposed construction that the personal identification

means does not have an independent battery or other power source.

Defendants' proposed construction is also based on the patentee's own definition of

"operational energy" in the specification of the '819 patent.  In each instance where "operational

---

[6] Defendants may also submit a separate motion for summary judgment of invalidity on this basis.

energy" appears in the specification, it states that an identification module that receives its

"operational energy" from an RF signal does **not** have its own battery or other power source.

- "The passive identification module has **no independent battery or power source but receives its operational energy from an RF signal** generated by the active communication module."  '819 patent, Abstract (emphasis added).

- "Yet a further feature is a system for identifying either a fluid container or an authorized person which utilizes a passive identification module that has **no independent power source but receives its operational energy from an RF signal** generated by the fluid delivery device."  '819 patent, col. 2, ll. 16-20 (emphasis added).

- **"The passive identification module has no independent battery or other power source.  Operational energy is received** from an active communication module . . . ." '819 patent, col. 16, ll. 8-11 (emphasis added).

Thus, the specification consistently states that a module that receives its "operational energy"

from an RF signal does not have a battery or other power source.  Because the patentee used the

claim term "operational energy" throughout the specification in manner consistent with only a

single meaning, the claims must be construed in accordance with that definition.  *Astrazeneca LP*

*v. Apotex, Inc.*, 633 F.3d 1042, 1052 (Fed. Cir. 2010) ("[W]hen a patentee uses a claim term

throughout the entire patent specification, in a manner consistent with only a single meaning, he

has defined that term 'by implication.'").  Rydex does not address this claim element in its brief,

presumably because it has no basis to oppose Defendants' well-supported construction.

### 2. "information regarding the fluid delivery transaction is stored" (claim 22)

| Rydex's Construction | Defendants' Construction |
| --- | --- |
| This term requires no construction | information relating to a commercial exchange involving delivery of fluid, such as price of fluid, type of fluid, date and quantity of delivery, that is memorialized for record keeping purposes |

Defendants' proposed construction for the term "information regarding the fluid delivery

transaction is stored" is consistent with the ordinary meaning of the term in the claim and in the

patent specification, and reflects the fact that the patent discloses and claims storage of information relating to a commercial exchange involving delivery of fluid and distinguishes such information from information relating to a vehicle or its operation.  Rydex, in contrast, seeks to have this claim term remain ambiguous by its request that the term not be construed.

Under the plain meaning of the words, "information regarding the fluid delivery transaction" does not refer to information regarding a vehicle, or even information regarding fluid delivery.  Rather it means information regarding the fluid delivery **transaction** itself—that is, the commercial exchange involving delivery of fluid, as explained in Section V.A, *supra*. According to the specification, information "regarding the fluid delivery transaction" includes, for example, "customer identification, authorization codes and credit account information attendant to a fuel or other fluid delivery transaction."  '819 patent, col. 15, ll. 32-35.  In contrast, "other information **unrelated** to a fluid delivery transaction" includes "operating and environmental conditions," "service operations performed on the vehicle," and detection of "leaking fuel."  '819 patent, col. 8, ll. 30-46 (emphasis added).  Rydex's attempt to stretch the scope of the term to include a vehicle's information regarding its fuel use, *see* Rydex's P.R. 3-1 Disclosures (highlighted excerpt attached in Appx. Tab 11), is misguided.

### 3. "memory key" (claims 38, 39)

| Rydex's Construction | Defendants' Construction |
|---|---|
| This term requires no construction | a memory module that is physically connected to a device to exchange data. |

Defendants propose that a "memory key" is "a memory module that is physically connected to a device to exchange data."  The specification of the '819 patent describes the memory key as a specific device:  "Such manifest information, as well as other information … can be communicated to … **a portable storage device such as a memory key available from**

**Datakey Corporation, Burnsville, Minn.**"   '819 patent, col. 4, ll. 26-33 (emphasis added).

Also, the memory key exchanges data through a physical connection.  *See, e.g.*, '819 patent, col.

10, ll. 45-47 ("The operator **inserts** the memory key 22 into an appropriate receptacle associated

with the fuel pump identification module 24.").[7]  As it was in 1990, even when the '819 patent

was originally filed, and even today, a Datakey memory key is a memory module that is

physically connected to a device to exchange data.[8]  This description is consistent with the

testimony of the attorney who drafted the '819 patent specification, who testified that a memory

key is "like what we call a flash drive."  Herink Depo. Tr., Appx. Tab 14, at 129:2-3.

Rydex disagrees with this construction, but does not explain how Defendants are

allegedly "limiting[t] the claims to a specific, preferred embodiment" or "read[ing] limitations from

the written description into the claims."  Rydex Brief at 16.  Rydex chose to claim the "memory

key."  Defendants simply propose defining that technology.  Interestingly, Rydex does not

explain what a memory key is.  In its tutorial, Rydex identifies the memory key as an RFID key

that communicates wirelessly, without a physical connection.  *See* Appx. Tab 4, at 12.  But the

'819 patent does not support such a construction.  Indeed, the patent distinguishes between a

memory key that exchanges data through a physical connection and a passive transponder that

exchanges data through a non-physical connection.  '819 patent, col. 4, ll. 26-35 ("Such manifest

information, as well as other information … can be communicated to … a portable storage

device such as a memory key available from Datakey Corporation, Burnsville, Minn., **or a**

**passive transponder with embedded memory such as is available from NDC Automation,**

**Inc., 3101 Latrobe Drive, Charlotte, N.C.**") (emphasis added).  Thus, a memory key cannot be

---

[7] *See also* '819 patent, col. 11, ll. 30-33 ("Another override function is provided by the 2K memory key 522 **that must be inserted** by the operator into the appropriate module of the fuel pump identification module."); col. 13, ll. 18-20 ("Additionally, the vehicle identification code is written to the memory key 222 upon its **insertion** by the operator."); col. 14, ll. 42-44 ("The system may be overridden only when an authorized memory key is **inserted** and the operator engages an override switch.") (emphases added).

[8] *See generally* http://www.datakeyelectronics.com.

-25-

construed to incorporate the concept of both a memory key and a passive transponder. *Comaper Corp. v. Antec, Inc*., 596 F.3d 1343, 1348 (Fed. Cir. 2010) ("There is an inference, however, that two different terms used in a patent have different meanings."). Rydex cannot now assert that a "memory key" includes a passive transponder, when the '819 patent differentiates these as separate devices and never suggests that the two devices are one in the same.

### 4. "ignition key" (claim 39)

| Rydex's Construction | Defendants' Construction |
|---|---|
| This term requires no construction | a mechanical key used in a motor vehicle to turn the ignition switch of the vehicle |

Defendants propose that "ignition key" means "a mechanical key used in a motor vehicle to turn the ignition switch of the vehicle." The '819 patent provides no help in analyzing the meaning of "ignition key" as the patent is devoid of any reference to an "ignition key." The question for the Court is what the meaning of "ignition key" would be to a person of ordinary skill in the art when the patent was filed in August 1990. *See Eon-Net*, 653 F.3d at 1320 ("As a general rule, claim terms should be given their ordinary and customary meaning to persons of skill in the art as of the effective date of the patent application."). Rydex asserts that it is improper for Defendants to limit an "ignition key" to a "mechanical key" because "many vehicle keys are **no longer** mechanical, but rather are electronic." Rydex Brief, at 16 (emphasis added). But that is not the issue.[9] It does not matter that some ignition keys today are electronic, or absent entirely from vehicles—for purposes of claim construction, the term must mean what it meant in August 1990. Rydex itself acknowledges that ignition keys were traditional mechanical keys at the time the patent was filed. *See* Rydex's Tutorial, Appx. Tab 4, at 5. In fact, electronic keys were not used for ignitions in vehicles until the mid 2000s, approximately the same time

---

[9] Rydex's characterization of current day vehicles as having electronic ignition keys is inaccurate, in any event. Many vehicles today need no ignition key at all inasmuch as the ignition lock cylinder has been eliminated entirely.

that Rydex added claim 39 during the reexamination proceeding.  *See, e.g.*, Joseph B. White, '*Honey, Where's My Keyless Fob*', THE WALL STREET JOURNAL, Oct. 1, 2005, Appx. Tab 12, at P7.  Therefore, Defendants request the Court to adopt their construction of "ignition key."

## VI.   RYDEX'S LATE ADDITION OF CLAIMS 39 AND 40 VIOLATES 35 U.S.C. § 305

During reexamination of the '819 patent, Rydex added dependent claims 39 and 40, seeking to improperly enlarge the scope of Rydex's claims in hopes of covering technology Rydex did not invent or disclose in its original patent.  As discussed above, Rydex now repeatedly attacks numerous facially reasonable constructions proffered by Defendants (e.g., a "fluid container" means a "reservoir for storing fluid") by arguing that these constructions would exclude the purported "preferred embodiments" described in—and only in—dependent claims 39 and 40.[10]  That is, Rydex repeatedly argues that terms in independent claim 22 must be construed broadly—not because the specification actually describes such "preferred" embodiments or because the plain claim language otherwise encompasses such embodiments—but because these dependent claims inject such embodiments.  Rydex's own arguments tellingly demonstrate the improper broadening nature of claims 39 and 40.  As such, these claims violate 35 U.S.C. § 305 and cannot be relied upon to broaden any other claims to encompass the pumping of fuel from internal vehicle fuel pumps to vehicle fuel lines.

### A.   Background

In December 2004, over a decade after the '819 patent originally issued, Rydex submitted a request to the Patent Office to have the patent reexamined.  *See* Request for Reexam., Appx. Tab 6.  Rydex stated that it wanted the Patent Office to confirm its patent over additional prior

---

[10] *See* Rydex's Brief, D.E. 301, at 8 (arguing that Defendants' construction "would exclude the preferred embodiment claimed in claim 39 which states that the fluid container comprises fuel lines leading to an engine of the vehicle"); *id.* at 12 (arguing that Defendants' construction would exclude a preferred embodiment that is claimed in claim 39); *id.* at 15 ("adding the 'commercial' limitation would exclude the embodiments claimed in claims 39 and 40").

art that had not previously been considered.  *Id*. at 26-31.  Specifically, Rydex contended *inter alia* that independent claim 22 was patentable as originally issued and without amendment.  *Id*. The Patent Office agreed and confirmed claim 22 without substantive alteration.[11]  *See* Office Action, Nov. 8, 2005, Appx. Tab 7, at 9 ("Claims 10, 21 and 22 are confirmed.").  Even though claim 22 was confirmed and Rydex did not need to amend its claims to distinguish prior art, Rydex nonetheless added new dependent claims onto claim 22.  *See* Amendment, Jan. 12, 2006, Appx. Tab 13, at 10.  Among these, claims 39 and 40 were added, which introduced brand new concepts not previously disclosed *anywhere* in the original patent:  the notion that the "fluid delivery system" could be "a fuel pump of the vehicle" and the "fluid container" could be the vehicle's "fuel lines."  *Id*.  These additions had nothing to do with distinguishing the prior art to confirm patentability (the proper purpose of reexamination).  And Rydex's patent attorney admitted as much.  *See* Herink Depo. Tr., Appx. Tab 14, at 167:2-10.  Instead, Rydex added these claims in an effort to redefine terms to specifically cover intended litigation targets (e.g., by defining the "fluid container" to now include "fuel lines leading to an engine of the vehicle").  *See id.*, at 104:20-106:7 (discussing that consideration was given during reexamination as to whether claims were "as broad as was justified" to try to cover products sold by automotive companies).  As a result of this manipulation, Rydex sought to obtain an enlarged scope of claim coverage that would now have applicability to the internal operation of a vehicle, but still dated back to the original 1990 priority date.  Then, Rydex sued the automotive industry.  Such a scheme cannot stand.  If it could, patentees would consistently rewrite their patents during reexamination in hopes of unfairly and unjustly covering the technological developments of others that the patentees did not actually invent.

---

[11] Minor, non-substantive changes were made to correct an "and" and to remove an errant period (".").  *See* Reexam. Certificate, Appx. Tab 1, at claims 21-22.

Not surprisingly, Rydex's scheme is precluded by statute and case law as an improper use of reexamination proceedings.  *See* 35 U.S.C. § 305 ("[n]o proposed amended or new claim enlarging the scope of a claim of the patent" is permitted during reexamination); *Total Containment, Inc. v. Environ Products, Inc.*, 921 F. Supp. 1355, 1382-83 (E.D. Pa. 1995) (finding it impermissible to add claim during reexamination not to distinguish prior art, but, rather, to cover a competitor's product).  Because Rydex added new dependent claims 39 and 40 seeking to enlarge its original claims, e.g., by adding new "internal vehicle" embodiments, rather than for the statutorily permissible purpose of distinguishing prior art, claims 39 and 40 are improper under 35 U.S.C. § 305.  *Quantum Corp. v. Rodime, PLC*, 65 F.3d 1577, 1584 (Fed. Cir. 1995).  As such, the Court must give dependent claims 39 and 40 absolutely no weight in assessing the scope of independent claim 22.

**B.      Two Critical Requirements Preclude Rydex's Improper Manipulation**

The reexamination statute, 35 U.S.C. § 305, imposes two critical requirements that each independently prevent the manipulations of the patent system Rydex attempts here:

**1.   Rydex Improperly Enlarged Its Claims During Reexamination**

First, "[n]o proposed amended or new claim enlarging the scope of a claim of the patent" is permitted during reexamination.[12]  35 U.S.C. § 305.  That is, claims cannot be enlarged in any respect during reexamination to cover new or different subject matter.  *Quantum Corp.*, 65 F.3d at 1584.  "An amended or new claim has been enlarged if it includes within its scope *any* subject matter that would not have infringed the original patent."  *Id.* (citing *In re Freeman*, 30 F.3d 1459, 1464 (Fed. Cir. 1994)) (emphasis added).  And, "[a] claim that is broader in *any* respect is considered to be broader than the original claims even though it may be narrower in other

---

[12] In addition, no new matter can be added.  35 U.S.C. § 132 ("No amendment shall introduce new matter into the disclosure of the invention."); 35 U.S.C. § 305 (incorporating requirement of section 132).

respects." *Id.* (emphasis added).  In other words, if any technology would infringe that would not have infringed the original claims, the claim is enlarged.[13]  Whether claims have been improperly enlarged during reexamination is a question of claim construction and thus a question of law for the Court.  *Id.* at 1580; *Creo Prods., Inc. v. Presstek, Inc.*, 305 F.3d 1337, 1344 (Fed. Cir. 2002).[14]

Here, dependent claims 39 and 40 are "enlarging."  Prior to the addition of these claims, Rydex could not in any way allege that vehicle fuel lines would constitute a "fluid container."  There is nothing in the patent (other than the dependent claims added more than a decade after the patent issued) to even suggest this application.  This fact is most easily demonstrated by Rydex exclusive reliance on the added dependent claims to argue that "fluid container" encompasses "fuel lines leading to an engine."  *See* Rydex Brief, at 8; s*ee also* D.E. 211, at 14; D.E. 223, at 2, 7.  The only description of the "fluid container" in the specification refers repeatedly (and not surprisingly under a plain and ordinary application) to a fuel tank or other fluid storage tank.  *See, e.g.*, '819 patent, col. 1, ll. 9-10; col. 4, ll. 37-45; col. 5, l. 12; col. 6, l. 36; col. 8, l. 42-43; col. 13, l. 63; col. 15, l. 15.

Tellingly, the original '819 patent never once mentions a vehicle's "fuel lines" at all, much less that these fuel lines could constitute the "fluid container."  Yet, Rydex added the dependent claims that expressly call out fuel lines as being a "fluid container."  As a result,

---

[13] As the Federal Circuit has explained:

> The purpose of the reexamination process is to provide a mechanism for reaffirming or correcting the PTO's action in issuing a patent by reexamining patents thought to be of doubtful validity. Consistent with this overall purpose, Congress enacted section 305 which, while allowing an applicant to amend his claims or add new claims to distinguish his invention over cited prior art, explicitly prohibits any broadening of claims during reexamination. If an applicant fails to claim as broadly as he or she could have, the proper recourse, if within two years of issuance of the patent, is to file a reissue application, see 35 U.S.C. § 251, not to remedy this problem in a reexamination proceeding.

*Quantum Corp.*, 65 F.3d at 1584.

[14] Because Rydex's compliance with 35 U.S.C. § 305 is a legal question of claim construction for the Court, the parties have agreed that this issue is properly addressed as part of the Court's claim construction process.  *See* D.E. 299 and D.E. 303.

subject matter that could not have infringed the original patent is purportedly expressly captured by the newly added dependent claims.[15]  This precisely fits the definition of "enlarging" set out in *Quantum Corp.*, 65 F.3d at 1584.  As a result, the dependent claims on which Rydex relies are improper and must be given no weight in determining the proper scope of terms contained in independent claim 22, such as "fluid container."  *See Total Containment, Inc. v. Environ Products, Inc.*, 106 F.3d 427, 1997 WL 16032, *2 (Fed. Cir. 1997) (attached as Appx. Tab 15) ("[The patentee] cannot, however, invoke the doctrine of claim differentiation by relying on a claim added during reexamination to interpret language in one of the original claims in a way that would broaden the reach of that claim.  To permit the use of claims added during reexamination for that purpose would invite manipulation of the reexamination process and would not be a reliable guide to the meaning of language used in the original claims.").

## 2. Rydex Added Its Dependent Claims For A Statutorily Improper Purpose

Second, patentees can only amend or add new claims during reexamination for limited purposes:  "in order to distinguish the invention as claimed from the prior art . . . or in response to a decision adverse to the patentability of a claim of a patent."  35 U.S.C. § 305; *In re Freeman*, 30 F.3d at 1468 (holding that, under § 305, "[the patentee's] ability to amend the claims during reexamination [is] not unfettered" and that "in light of the fundamental purpose of reexamination . . . amendment of claims during reexamination is limited to amendment in light

---

[15] Rydex will likely contend that dependent claims cannot be enlarging because dependent claims add further limitations to independent claims.  It is correct that the law requires proper dependent claims to add further limitations.  *See* 35 U.S.C. § 112, ¶ 4 ("[A] claim in dependent form shall contain a reference to a claim previously set forth and then specify a further limitation of the subject matter claimed.  A claim in dependent form shall be construed to incorporate by reference all the limitations of the claim to which it refers.").  But dependent claims can be written in a broadening manner, which renders them invalid.  *See Pfizer, Inc. v. Ranbaxy Labs. Ltd.*, 457 F.3d 1284, 1291-92 (Fed. Cir. 2006) (holding that a dependent claim was invalid under 35 U.S.C. § 112, ¶4 where the dependent claim included subject matter not within the scope of the claim from which it depended).

of prior art raising a substantial new question of patentability.").  New claims that are added

during reexamination for any other purpose are impermissible.[16]

Here, the reexamination history indisputably demonstrates that dependent claims 39 and

40 were not added by Rydex to avoid the prior art.  Rydex contended that independent claim 22

was patentable as originally issued, and the Patent Office agreed.  *See* Appx. Tab 6, at 26-30

(Rydex arguing); Appx. Tab 7, at 9 (Patent Office confirming).  In other words, the original

claims were already distinct from the prior art, and there was no need to amend.  It was only

*after* the Patent Office had already confirmed claim 22 that Rydex added the new claims

depending from claim 22.  *See* Amendment, Jan. 9, 2006, Appx. Tab 13, at 9-10 (adding claims

39 and 40, which redefine "container" to include "fuel lines leading to an engine of the vehicle"),

*id.* at 11 (noting claim 22 confirmed).  Thus, at the time Rydex added the dependent claims, there

was no need or reason to amend to distinguish the prior art.  And Rydex's patent attorney who

prosecuted the reexamination, Mr. Kent Herink, admitted that he did not add the dependent

claims to distinguish the prior art.  Herink Depo. Tr., Appx. Tab 14, at 167:2-10.

Rather, as Rydex expressly admitted in its filing, Rydex added these claims "to more

particularly point out and distinctly claim the subject matter that [Rydex] regard[ed] as the

invention."  Remarks, Jan. 9, 2006, Appx. Tab 13, at 13.  Mr. Herink also confirmed that Rydex

was attempting to ensure that it was claiming as broadly as it could.  *See* Herink Depo. Tr.,

Appx. Tab 14, at 104:20-106:7, 167:2-10.  Fundamentally, because Rydex was not attempting to

distinguish prior art, the dependent claims were added for an improper purpose.  For this

---

[16] *See Total Containment*, 921 F. Supp. at 1382-83; *Southwestern Bell Tel., L.P. v. Arthur Collins, Inc.*, 464 F. Supp. 2d 588, 595-96 (N.D. Tex. 2006) (granting summary judgment as to new claims that were added during reexamination to circumvent a prior court's claim construction order, rather than to distinguish prior art), *aff'd* in *relevant part*, 279 Fed. App'x 989, 992 (Fed. Cir. 2008) (affirming summary judgment "for improper claim amendment under 35 U.S.C. § 305"); *cf. Cordis Corp. v. Medtronic, Inc.*, 511 F.3d 1157, 1184-85 (Fed. Cir. 2008) (holding that narrower claims added in response to a prior art rejection during reexamination were not invalid under § 305 because the claims were added for the statutorily permitted purpose of distinguishing the cited prior art).  This determination "requires an inspection of the file histories for the patents in suit" by the Court.  *Id.*

additional reason, Rydex cannot now rely on its impermissible dependent claims to more broadly construe independent claim 22.  *See Total Containment*, 106 F.3d 427, 1997 WL 16032, at *2 (rejecting attempt to rely on dependent claims added during reexamination to broaden meaning of language in original claims).

## VII.   <u>CONCLUSION</u>

For the foregoing reasons, Defendants' respectfully request that the Court find that Rydex improperly added claims 39 and 40 during reexamination in violation of 35 U.S.C. § 305, and adopt Defendants' proposed claim constructions for all disputed claim terms.

Dated: June 20, 2012

Respectfully submitted,

_____/s/_____
Joseph M. Beauchamp
Texas Bar No. 24012266
S.D. Texas Bar No. 24263
Anna E. Raimer
Texas Bar No. 24072868
S.D. Texas Bar No. 1148442
JONES DAY
717 Texas, Suite 3300
Houston, TX 77002-2712
Telephone: (832) 239-3939
Facsimile:  (832) 239-3600
Email: jbeauchamp@jonesday.com
aeraimer@jonesday.com

*Counsel for Defendant American Honda
Motor Co., Inc.*

_____/s/_____
Raymond A. Kurz
District of Columbia Bar No. 358544
Celine J. Crowson
District of Columbia Bar No. 436549A
Robert J. Weinschenk
New York State Bar No. 4491940
Hogan Lovells US LLP
Columbia Square, 555 Thirteenth St. NW
Washington, DC 20004
Telephone: 202-637-5600
Facsimile: 202-637-5910
E-mail: celine.crowson@hoganlovells.com
raymond.kurz@hoganlovells.com
robert.weinschenk@hoganlovells.com

Tom Bayko
Texas State Bar No. 01864500
Joshua James Newcomer
Texas State Bar No. 24060329
Hogan Lovells US LLP
700 Louisiana Street, Suite 4300
Houston, TX 77002-2712
Telephone: 713-632-1400
Fax: 713-632-1401
Email: tom.bayko@hoganlovells.com
Joshua.newcomer@hoganlovells.com

*Counsel for Defendants BMW of North America, LLC, and Mercedes-Benz USA, LLC*

_____/s/_____
Jeffrey K. Sherwood
Texas Bar No. 24009354
Frank C. Cimino, Jr.
District of Columbia 462406
Charles J. Monterio
District of Columbia 495483
Dickstein Shapiro LLP
1825 Eye St. NW
Washington, DC 20006
Telephone: (202) 420-3602
Facsimile: (202) 420-2201
E-mail: sherwoodj@dicksteinshapiro.com
ciminof@dicksteinshapiro.com
monterioc@dicksteinshapiro.com

Andrew A. Phillips
Connecticut 429394
Dickstein Shapiro LLP
1633 Broadway
New York, NY 10019
Telephone: (212) 277-6709
E-mail:phillipsa@dicksteinshapiro.com

*Counsel for Defendant Chrysler Group LLC*

_____/s/_____

Eric A. Buresh
State Bar No. 19895
Jason R. Mudd
State Bar No. 57850
ERISE IP, P.A.
6201 College Blvd, Suite 300
Overland Park, KS 66211
913.777.5600 (Tel.)
913.777.5614 (Fax)
eric.buresh@eriseip.com
jason.mudd@eriseip.com

*Counsel for Defendants Ford Motor
Company and Mazda Motor of America, Inc.
d/b/a Mazda North American Operations.*

_____/s/_____
Charles Gorenstein
State Bar No. 28606
Ali M. Imam
State Bar No. 501304
Birch Stewart Kolasch and Birch LLP
2110 Gatehouse Rd., Suite 100 East
Falls Church, VA 22042
Telephone: (703) 205-8000
Facsimile: (703) 205-8050
E-mail: cg@bskb.com
ami@bskb.com

J. Chad Newton
State Bar No. 24041584
Jesse R. Pierce
Pierce &O'Neill, LLP
4203 Montrose Blvd.
Houston, TX 77006
Telephone: (713) 634-3606
Facsimile: (713) 634-3601
E-mail: cnewton@pierceoneill.com
jpierce@pierceoneill.com

*Counsel for Defendant Mitsubishi Motors
North America, Inc.*

-38-

_____/s/_____
Jeffrey J. Cox
Jeffrey S. Patterson
Hartline Dacus Barger Dreyer LLP
6688 N. Central Expressway, Suite 1000
Dallas, TX 75206
Telephone: 214-346-2100
Facsimile:  214-369-2118
Email: jcox@hdbdlaw.com
jpatterson@hdbdlaw.com

*Counsel for Defendant Nissan North America, Inc.*

_____/s/_____

David J. Beck
Texas State Bar No. 00000070
Michael E. Richardson
Texas State Bar No. 24002838
Beck, Redden & Secrest, LLP
1221 McKinney, Suite 4500
Houston, TX 77010
Telephone: (713) 951-3700
Facsimile: (713) 951-3720
E-mail: mrichardson@brsfirm.com

Richard D. Kelly
State Bar No. 15024
Robert C. Mattson
State Bar No. 43568
Eric W. Schweibenz
State Bar No. 472519
John F. Presper
State Bar No. 422224
Lindsay J. Kile
State Bar No. 78686
Oblon, Spivak, McClelland,
   Maier & Neustadt, LLP
1940 Duke Street
Alexandria, VA 22314
Telephone: (703) 413-3000
E-mail: rkelly@oblon.com
rmattson@oblon.com
eschweibenz@oblon.com
jpresper@oblon.com
lkile@oblon.com

*Counsel for Defendants Subaru of America,
Inc., and Toyota Motor Sales USA, Inc.*

## <u>CERTIFICATE OF SERVICE</u>

The undersigned hereby certifies that all counsel of record who are deemed to have consented to electronic service are being served with a copy of this document via the Court's CM/ECF system per Local Rule CV-5.3 on June 20, 2012.

    /s/ Joseph M. Beauchamp

Joseph M. Beauchamp
